Mr. Aguilar's case-specific testimony plainly violated Rather than begin with the most obvious way, which was Aguilar's relaying of Lisbeth Cologne's opinions and conclusions in support of his own, I'd like to begin with the more foundational violation of Mr. Brown's When Mr. Aguilar conveyed this information, he was serving as a mouthpiece for out-of-court assertions by the laboratory. What exactly is, just so I'm clear, I'm not sure I understand the science, what is the out-of-court assertion from the lab itself? So I'm thinking about, by contrast to Melendez-Diaz or Bulkuming, where it's like, Melendez-Diaz is like, the assertion from the lab seemingly is like, this is coke, or Bulkuming, the blood alcohol content was thus and such. So what's the analogous assertion from the lab here? Sure. The most closely analogous case discussing an analogous assertion would be Williams v. Illinois. So in that case, the assertion at issue was that the DNA profile came from a swab of the victim's body. So the source of the DNA profile was the assertion at issue. I guess, in Williams, didn't the court in Smith look back on Williams and say, couldn't really decide much there, split court, no conclusion? It seemed like there was a debate in Williams about whether that was called, I don't know, basis data or something, or an assertion, and it seems like the court just couldn't quite decide. I respectfully think that the debate in Williams was slightly different. So five justices agreed, I think they all agreed what the assertion was at issue, and that was the expert who testified, conveying another laboratory's assertion that the profile, in fact, came from the victim. That was the assertion at issue in Williams, and I don't believe my reading of that case is none of the justices debated, was that an assertion, or was it out of court? The issue is, was it offered for its truth, and was it testimonial? And five justices found that it was offered for its truth, but Thomas joined the other plurality in conclusion, because he found that that statement, that the DNA profile came from the victim, was non-testimonial, but that statement is very different than the laboratory situation we have here, because in Williams, the laboratory that extracted that DNA profile did so when they did not know who the suspect was. So essentially what Thomas said, and he ended up being the clinching vote in that case, he said, well, that's not testimonial, that's not sort of accusatory, because the issue that the lab that extracted the profile from the victim's swab, they were trying to catch a, quote, at-large rapist. That was what the purpose of that statement was. And is that, even giving that sort of the most charitable reading, is like the piecing together of a five-justice majority, does that get it done on plain error? It does, because that five-justice majority in the dissent became the Smith v. Arizona opinion. So Kagan wrote the dissent in Williams v. Illinois, and she wrote the majority in Smith v. Arizona, and explains, I think, most helpfully, what the issue was there, where the disagreement was, and the disagreements don't apply here. So there is no question now, under Smith v. Arizona, was that statement offered for its truth? That expert conveying the out-of-court assertion of another laboratory as to the source of the DNA profile. And the answer after Smith is, yes, that information was offered for its truth. And in order to get that information in, the state of Illinois would have had to bring somebody who got that DNA profile from that other lab, who could say, yes, this profile was extracted from the victim's body, or from the swab that we received from the victim. We have, in this case, the situation where Aguilar conveyed and relied upon the truth of the laboratory's work. And he repeatedly mentioned the fact that he himself did no laboratory work, and Cologne did no hands-on laboratory work, and the laboratory at DLI gave them a DNA profile. So let me ask one more question, and then I'll zip it. You can ask as many questions as you want. So the last one for me, for the time being. I'm just trying to figure out the limits of your principle. For instance, does every old x-ray tech have to testify when a radiologist reads an x-ray? I'm trying to figure out how many lab technicians are we talking about, and how many different kinds of cases? Anybody who touches the data? So it would be a person. It could be a single person. I have seen cases where one person did the DNA work from the beginning to the end, and I have seen other cases where it were, say, six people. I can't say because it depends on the laboratory, and it depends on how they do their work, and they're all different. But it needs to be someone who can testify that the lab has these DNA profiles. So I guess just to dumb it way down, where imaging matters in a case, the radiologist is not going to be good enough. You're going to need the MRI tech or the x-ray tech or something like that. Who took the images. You're going to have to have that person and maybe multiple people in the lab. It may be, I just want to politely correct you, this isn't my principle. It's the Supreme Court's principle. It's the Confrontation Clause's principle. Mr. Brown has a right to directly confront the people who are going to say this evidence is what we say it is. And so if that ends up being 2,000 witnesses, because of the very unusual way in which a particular piece of forensic evidence was produced, then it's 2,000 witnesses. I don't think it ever would be. We don't know because, of course, no one from the laboratory testified. I guess I'm a little confused about that. So someone from the laboratory did testify, Mr. Aguilar, correct? He actually is employed by a laboratory. He's employed by a laboratory, but he's an analyst. And in this case, he was a reviewer. Maybe I'm confused because what he testified was, he goes, a second person, a second analyst will then repeat the same process and make sure they agree with all the conclusions that the first analyst came to. So in this case, Ms. Lizbeth Colon actually went through the entire process of writing the case and I came behind her and repeated the same process and I agree with all those findings. And then he walked and he talked about going through and analyzing swabs inside the mask and I guess inside the orange bottle. So I guess my question is, are you suggesting that that was not sufficient because you needed to have the person from another lab? No. I'm saying that someone from the lab. So yes, big picture, they all worked at DLI Laboratories, the company. But Mr. Aguilar testified that his job was the technical reviewer and also that he is an analyst, not a laboratory worker. But he said he went through the same process as the first person. So the way I read it, and that's why I'm asking you this question, is that he went through and did the same process that the first analyst did. He went through and did the same process, according to his testimony, as Colon. But Colon, quote, is not doing the hands-on laboratory work. That's from the District Court Docket Entry 84, the second day of the trial transcript on page 80. Colon did no hands-on laboratory work. Her and Aguilar received documentation, data, and the DNA profiles from the laboratory and they analyzed those profiles. So Aguilar himself and Colon, likely, I can't say, she didn't testify, had no personal knowledge as to the actual source of those DNA profiles. So they could have, Aguilar could have testified. It wouldn't have been relevant. There would have lacked foundation as to the analysis that he did. But he could not have testified, as he did, that the DNA profiles came from Mr. Brown, came from the orange soda bottle, came from the black mask, because he had no personal knowledge of that. And I believe that's very clear from his testimony, where he repeatedly says, for example, on page 77 of the same transcript, my position now entails only doing the laboratory portion. You know, there's no objection made. I mean, there's testimony here where they ask him, do you recognize these items presented to you? Yes, I do. They bear our labels. We put them in there when we receive them and log them into our internal system, and they're previously sealed with evidence tape. And were those analyzed, or were you asked to analyze them? Yes, there are three items. And these items in question, 9A and 9B, those are the swabs from the mouthpiece of that orange soda bottle and the swabs of the inside of the mask. Is that correct? That is correct. I mean, again, this is all coming in as evidence in this trial, and there's no objection. That's right. We're on plain error. However... No, I understand that, but I don't understand how you can't, if this is going to be an issue, how there is no objection made at the time saying to the district court, we're not agreeing to the introduction of this evidence because there is a confrontation clause problem. At the time of this trial, which was before Smith v. Arizona, before the cert was granted, there was a lack of clarity as to whether experts could convey the factual assertions of out-of-court individuals as the basis for this opinion. So that was the state of the law at the time. I can't speak for why there wasn't an objection as a quarterback. Now I could say there should have been, but it wasn't the law at the time, and it is now. If there are no further questions, I'll save the rest for rebuttal. Thank you. Very well. Thank you. Mr. Fagan? Thank you, Your Honor. Eric Fagan for the government. May it please the Court, if I'm understanding what I just heard opposing counsel say, she's asking this Court to recognize for the first time something that no other court of appeals has recognized post-Smith, and that this Court certainly hasn't recognized post-Smith, and that Smith itself, I think, casts the very least significant doubt on for the first time in a case that comes up to the Court on plain error review. There is nothing in Smith that I think remotely says that every person who touched a piece of DNA has to testify. I think Smith says quite the opposite. Let me take a step back for a second. As we cite on pages 13 to 14 of our brief, plain error review is going to require a case from either this Court or the Supreme Court that directly addresses the issue. They're asserting that Smith is such a case. It really can't be because of the factual differences between the cases and the inapplicability of Smith's very limited holding. First of all, just as quickly as to the factual differences between the cases, in Smith you had an expert who came in who had never previously been involved and kind of parachuted in three weeks prior to trial, read someone else's report, and then testified from that report. That's quite clear from the portions of that expert Longoni's testimony that's quoted at pages 796 to 797 of the Smith opinion in the U.S. reports. Then in this case, as Judge Legault was pointing out in her questioning, you don't have that at all. On page 80 of the main trial transcript, a documentary 84, you have Aguilar testifying that both in general and in this case, someone in his role comes in and repeats the process that the initial analyst, in this case, Colon, did. The entire basis for Smith, I think, and the Smith holding itself is out of this case. I think her stronger argument, and I think she recognizes that her stronger argument is not Aguilar duplicating Colon, but Aguilar testifying as to what the lab techs did. She says, you can look at Williams and sort of, I can find five, she says, in Williams for that proposition. Then she says, that sort of filtered through Smith and it arrives on this court's doorstep in that manner. I think that would be a sweeping new rule that Smith absolutely does not recognize and that, in fact, I think Smith throws a lot of water on. But let me take a step back. You said, first of all, you look at Williams and I heard some discussion of Williams in the opening argument this morning. Under Williams, we win because I don't know that anything under Justice Thomas' concurrence, sorry, yeah, under Justice Thomas' it was a concurrence. Under his concurrence, nothing those lab techs said is going to be testimonial on his view because it's not formally written up in a certificate or anything. There is a certificate in this case, but it wasn't actually introduced at trial. It was produced by Colon and it was the subject of a motion to supplement the record on appeal. So it's not actually part of the trial record at all, and there's no reason to believe that any of these lab techs that are being referenced now produced anything formal enough in nature to satisfy Justice Thomas. I actually think there's a significant question whether their statements would even be testimonial under the court's typical approach of a primary purpose. And this is getting to some of the distinction with Smith because Smith makes quite clear, this is on either page 801 or 802, that not everything someone says in a lab is going to be testimonial. It's often produced for purposes of accreditation or internal review. Also, there are serious record deficiencies here as to what any of these lab techs might have been doing, and I think those record deficiencies on plain error review are going to be attributable to the defendant, and they may have been just scriveners running things through machines for all we know. So just about the blocking and tackling of this lab analysis here, is the conclusion that sort of emanates from the lab and then that is subject to the analyst's evaluation, is that conclusion that this was a single male contributor, is that like the ultimate sort of product of the lab's work? Well, I think the lab also did match it to Mr. Brown's profile as well, so I think there is that piece of it as well. And I'm not going to, I think the fair reading of the testimony on page 80 is that Cologne did not alone do all of the DNA work in this case. But I think there's a distinction, and I think this is critical. So I'm sorry, so maybe I'm just, how is then that different from Melendez-Diaz and Volkoming, where like out of the lab you get what seems like a fairly significant piece of factual evidence, that was Coke, blood alcohol content was thus and such. Here, there's a match. So in Melendez-Diaz you just had them trying to introduce the certificates recording the lab results without someone available to question them, just something like business records. In Volkoming you had someone who hadn't been involved in the case at all just come in and say, yeah, these are our certificates, and that wasn't satisfactory either. But so on Volkoming, is Cologne any better situated than some random nobody? Absolutely. Sorry, I guess Aguilar. I'm sorry, I'm mixing people up. I thought Aguilar said, look, none of us know what happened in the lab. We're all just sort of taking what the lab gave us and then working from there. Absolutely, Your Honor, and that's for two critical reasons. One of them I've already discussed, which is it's not clear that the lab work is itself testimonial. At some point they know they're going to come in and give information to court. But the lab tech, and I think it's clear from the certificate that's in the appellate record, again, not the trial record, and also from Aguilar's own testimony, that Aguilar and Cologne both knew, like all the pieces of this, that they were trying to match something up to a known suspect. But I don't know that that's necessarily going to be true for the lab techs. The lab techs could have just seen, okay, this is sample number 53 for the day. I'm going to run it through this machine, and here's the output it produces. They'd just be a scrivener, or even if there was some more detailed analysis going on, they might have just known they were running sample 53 and not known for what purpose. DNA labs run all sorts of things for all sorts of reasons. I assume like 23andMe outsources some of its DNA analysis to a lab, so for all they know, they could have been running one of their samples. The other reason I think this is very critical, and it's kind of latent in Smith, but it's quite clear in Smith, I think it's clearest on page 799 in the U.S. reports, is that the court distinguishes what happened in that case, where, again, you had one expert, Longoni, testifying, having had nothing to do with the case before, basically from the report, and that's all they ever looked at, of another expert, Rast, and as we've already discussed, that's not what happened here, where you had Aguilar do the same thing, according to him as Cologne. The court distinguishes the problem with Longoni just kind of coming in and reading Rast's report, which is just kind of a sneaky, clever, no, that's not going to work way of getting around bull coming, and the court distinguishes that from the kinds of testimony that you could give, and the kinds of testimony a single expert could give that avoids needing everyone in the lab to come in is the traditional basis evidence under Rule 703. The court specifically references as helpful or useful, I forget which word the court uses, the discussion of pages 36 to 41 of the transcript in Smith, and if you look at those pages, which the court is expressly distinguishing the scenarios, particularly on pages 40 to 41, there's a colloquy between government counsel and Justice Gorsuch that makes clear that one thing that someone could do, that an expert could do, is testify under Rule 406 to the typical habit and practices and procedures of the laboratory. Now, in our view, that's going to provide, and I think this is what we are communicating to the court on those transcript pages and the express distinction that the court is making at page 799 of Smith, is that that kind of basis evidence, that kind of evidence of habit and procedure, that's usually what we do, is going to be sufficient to allow the jury to conclude that that is what happened in this case. And that's even aside from the whole testimonial piece, which is another element that they would have to satisfy to implicate the Confrontation Clause. So it's the basis evidence. The 406 link is what distinguishes Aguilar in this case from the random Joe on the street. He's like vaguely—he's employed by the same lab, so he's at least able to say this is standard practice. Not only is he able to say that, he says that specifically. If you look at pages— I guess I mean he says it, but like he is authorized to say it. Oh, absolutely, Your Honor. He testifies on page—unlike in Smith where you had testimony that Rass did this, Rass did that, here what you principally have, and I think the rest of his testimony needs to be understood in this context, is if you look at pages 82 to 83 of Docket Entry 84, you'll see that what Aguilar says is he says, generally what happens in these cases, we follow this process. Now, the jury—that goes to wait. The jury may not really believe that that's enough evidence that that's actually what happened in this particular case, but it does provide enough evidence from which to testify. And again, if counsel was worried about—Defense counsel was worried about any of this being taken for anyone being given the wrong impression about anything, they're perfectly entitled, and this is directly under the federal rules of evidence under the expert testimony rules about basis, principally Rule 703, to a limiting instruction that would have informed the jury to only take the evidence for basis evidence and not evidence of something actually happening, or, you know, the mention of Cologne as mentioning only that, you know, just noting what Aguilar's role vis-a-vis the entire process was. But none of that happened. We're on a plain error review, and I don't think this court— In Justice Alito's concurrence, which was joined by Chief Justice Roberts, didn't they have the opposite reading of that as you—because Justice Alito, his view of the majority opinion in Smith was that the court seems to think that all basis testimony is necessarily offered for its truth. Well, I don't think—I think that may be some kind of, you know, one of these dissenting opinions that— or concurring opinions, in this case, that kind of says the sky is falling to some degree when I don't think that's at all clear from majority opinion. I think the majority opinion does take great pains, and again, I'd point the court at page 799, pages 36 to 41, and it's—I think page—there's another page where they cite a portion of the oral argument transcript for the testimonial piece of it. I think that's page 802. It might be page 801 where they cite, like, transcript 51. And I think what the court is distinguishing there is exactly what, you know, principally those were colloquies with government counsel. I think exactly what they're distinguishing is exactly the kind of basis evidence they have here. If the court were actually saying that what you have to do is get everyone who's ever touched the piece of DNA into court, that would be an incredibly destabilizing thing that you'd think the court would not leave to, you know, as an exercise for the reader to kind of read between the lines and divine. Instead, what the court did was address the situation in front of it where you had an expert parachuting in and just parroting someone else's testimony, which is a sneaky, clever, unsuccessful way of getting around bullcumming. And then it distinguished these other scenarios for another day. Now, it may be that the court grants a follow-up case to clarify that, and maybe there will be occasion for this court to try to read between the lines more of Smith if the court is inclined to agree with more of a sky-is-falling impression. But I don't think a case— The sky-is-falling sort of scenario is mitigated by the fact that this is really a bifurcated consideration. We've been talking a lot about whether it's testimonial, but there is still the testimonial piece that's out there. And really what this was addressing was whether it's being offered for its truth. So doesn't that sort of bifurcation sort of mitigate the sky-is-falling scenario? I would hope that it would if we were in that scenario, Your Honor, but I don't think we are in that scenario because I think even on the for-the-truth-of-the-matter asserted piece, I don't think nose-counting in Williams is going to be what matters here for that. I think what matters here for that is what the court said in Smith. And what the court says in Smith is it's distinguishing kind of just vouching, reading someone else's report from just evidence that is sufficient— not a lot of weight to it, but it's sufficient— to allow a jury to conclude that this is what we usually do, and the jury can infer that's what was done in this case. I see my red light is on. Okay, very well. Thank you.  Ms. Cain, you've got five minutes remaining. Thank you. I'm going to quote from Smith at page 799. If Rast—that's the out-of-court expert in Smith— if Rast had lied about all those matters, Longoni's expert opinion would have counted for nothing, and the jury would have been in no position to convict. So the state's basis evidence, more precisely, the jury's basis evidence, the truth of the statements on which its expert relied, propped up its whole case, but the maker of those statements was not in the courtroom, and Smith could not ask her any questions. This is why in the briefing I said Smith applies on all fours to bar Aguilar's case-specific testimony. It doesn't apply to bar Aguilar's testimony about what generally happens. We're not challenging that. He properly testified about what generally happens. However, in testifying about what generally happens, he informed us that he didn't do any laboratory work, that neither did Colon, and therefore when he conveyed that the laboratory gives us the DNA profiles, he told us, I am relaying for its truth what the laboratory told us about where these DNA profiles really come from. Mr. Brown had an absolute confrontation cause right to cross-examine the people from the lab about whether those profiles really came from the evidence or from him. As we are standing here today, we do not know as a fact that the profiles that Mr. Aguilar analyzed came from Mr. Brown. Okay, but don't we have, I mean, that's where it goes to like a chain of custody because Aguilar does testify that the process in the lab is, you know, the samples come in, they're in an evidence bag, they're sealed, and then they're put in a vault, and then they're removed in order to test them, and then they're put back in the vault. So are you suggesting then that you have to have someone come in to testify about chain of custody? It is adjacent to chain of custody evidence, but this isn't really just an evidence question. It's a confrontation clause issue. The DNA profiles— I understand, but I'm just trying to figure out how it would play out in the real world. It depends on the lab. There could be— I'm talking about this case. I don't know. Well, but you have testimony about how it proceeds, which is it comes in, it's seized, it's under evidence, it's sealed, and it's put in a vault. So would your testimony be— I'm just trying to figure out who exactly would have to testify. You're going to have to have a police officer who comes and brings it in? We have that. Okay. Then you have the person who puts it in the vault? I'm just trying to figure out how many people are testifying. Except from his general testimony. I don't know as a fact how many people are involved, so it's hard to answer that question. I don't know because he does say, for example, he lists a specific role in the lab, a serologist takes the swabs from the evidence vault, right, and cuts the swabs. He doesn't say whether the serologist is involved in the next four steps of DNA processing, extraction, and producing the profile. I don't know. I'm not a scientist, and I'm not a DNA expert. So it could be that the serologist just took the evidence from the vault, cut the samples, and handed it off to someone else. In that case, we would need the serologist and who she handed it off to, or someone who observed that process. So I can't say because I don't know exactly how the lab works, and neither do any of us. On the testimonial point, Crawford tells us the statements made under circumstances, which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial or testimonial. The idea that the lab techs in this case would not have understood that at least their assertion that the profiles came from the evidence and Mr. Brown, that they did not understand that would be used at a future trial, it strains credulity, honestly. Of course they did. Mr. Aguilar testified that the lab receives a case summary with the police officers or the agent's submissions, and this occurred one week before trial. So also I want to note the expert in Smith came from the same lab as the expert he or she testified for, just like Aguilar. Aguilar is not so different at all from the expert in Smith because he came in after the fact, after the laboratory produced their testimonial DNA profile with the sourcing, after Colon wrote her report, and he provided surrogate testimony in much the same way that Smith v. Arizona told us violates the confrontation clause. If there are no further questions, I ask your honors to vacate Mr. Brown's conviction and sentence. Thank you. Very well. Thank you both. The case is submitted.